**INTRAWEST FINANCIAL CORPORATION, a Colorado corporation, and First Interstate Bank of Denver, N.A., Plaintiffs,**

**v.**

**WESTERN NATIONAL BANK OF DENVER, Defendant.**

**Civ. A. No. 82–C–2159.**

United States District Court,
D. Colorado.

June 7, 1985.

Michael McIntosh, Denver, Colo., for plaintiffs.

I. Thomas Bieging, Robert Purcell, Englewood, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Intrawest Financial Corporation and IntraWest Bank of Denver, N.A. filed this action against Western National Bank of Denver, N.A. on December 16, 1982 claiming service mark infringement in violation of 15 U.S.C. § 1114, false designation in violation of 15 U.S.C. § 1125, unfair competition, and service mark infringement under Colorado trademark law and the common law. Plaintiffs seek to enjoin the defendant from using the marks "The First National Bank of Denver" and "First of Denver." Western National Bank defends on the ground that IntraWest Bank of Denver has abandoned its rights to the mark, "The First National Bank of Denver," and therefore there has been no infringement. On October 1, 1983, First Interstate Bank of

Denver, N.A. was substituted as plaintiff for IntraWest Bank of Denver, N.A. after a name change incident to First Interstate's acquisition of IntraWest. Trial to the court was held May 13 and 14, 1985. The issue to be decided is whether the plaintiffs have abandoned their rights to the tradenames or service marks "The First National Bank of Denver" and "First of Denver." Jurisdiction is founded on 15 U.S.C. § 1121 and 28 U.S.C. § 1338. This memorandum constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.[1]

## I. FINDINGS OF FACT.

I make the following findings of fact:

1. The First National Bank of Denver was chartered in 1865 in Denver, Colorado as a national bank.

2. During the 1970's The First National Bank of Denver was the largest or second largest bank in the Denver metropolitan area.

3. About 1971, The First National Bank of Denver began using the service mark "First of Denver" to identify its banking services. "First of Denver" was registered by The First National Bank of Denver in the United States Patent and Trademark Office on December 23, 1975 for use in connection with banking services.

4. In 1968, certain officers and the chairman of the board of The First National Bank of Denver formed First National Bancorporation to conduct business as a bank holding company. That year, First National Bancorporation, through an exchange of stock, acquired The First National Bank of Denver and three Denver suburban banks. In 1982, the Bancorporation owned fourteen Colorado banks.

5. The First National Bank of Denver and First National Bancorporation changed their names to IntraWest Bank of Denver,

---

1. To the extent any of the following findings and conclusions may be inconsistent with my February 23, 1984 order regarding summary judgment, that order is hereby vacated. I have

been moved to reconsider that order by events that have occurred or been brought to my attention since that date.

N.A. and IntraWest Financial Corporation, respectively, on October 1, 1982.

6. Discussions about the change of name started at least a year before the change was effected.

7. On February 24, 1982, the Board of Directors of the First National Bancorporation approved the corporate name change to IntraWest Financial Corporation with the expectation that the Board of Directors of each subsidiary bank would change its name to begin with the word "IntraWest."

8. Also on February 24, 1982, the Board of Directors of the First National Bank of Denver approved the change of that bank's name to "IntraWest Bank of Denver, N.A."

9. A corporate identity task force was formed by First National Bancorporation and The First National Bank of Denver and it began the process of changing the parent and subsidiary names. This task force planned a major advertising campaign and coordinated the transition to new bank forms, new stationery, new customer checks, new customer bank cards, new signs and new building names.

10. In announcing the planned name change to the stockholders of the First National Bancorporation, the following explanation was given:

"A common identification between the names of the parent corporation and its subsidiary banks which would strengthen their marketing efforts and better position the parent corporation to market new or acquired banks and other subsidiaries.

A new parent corporation name that can be used by all of its subsidiary banks and can be applied effectively to operations on an expanded regional or even a national scale which could not be done with the existing name of the parent corporation.

The existing name of the parent corporation cannot be applied as a common, unifying element with the subsidiary bank names."

11. In April 1982 the shareholders of First National Bancorporation approved the change of the corporate name to IntraWest Financial Corporation. At this shareholders meeting the Chairman of the Board detailed the reasons for the change of name as follows:

"The name First National has served long and honorably but it has ceased to be a franchise which we alone can claim. There are more than 900 first National Banks of something or other in the United States—48 of them in Colorado—but only 8 of those 48 are part of our company. Equally important we have banks in several important Colorado communities where a First National charter belongs to someone else and the resulting confusion among investors and customers we believe works to our extreme disadvantage.

IntraWest Financial Corporation was selected as the recommended new name because it identifies the market area in which we expect to be predominant, it provides the flexibility to describe a number of new services we may choose to offer and it is unique in both marketing and trademark considerations."

12. First National Bancorporation filed an application in the United States Patent and Trademark Office in June 1982 to register the name "IntraWest Financial Corporation."

13. A memorandum dated September 26, 1982, advised the Chief Officers of all subsidiary banks of suggested responses to inquiries made by the news media. Among the suggested responses to inquiries were:

"Q. Why the name change?

A. The name change was initiated to position us with a single identity through the corporation. There are more than 40 banks in Colorado, and hundreds nationwide, that have the name 'First National.' Only eight of these are affiliated with First National Bancorporation and, in all, the 15 banks in the holding company have seven different names. That has added to the confusion in the minds of consumers. The only common link we have re-

tained in a modified form. In essence, the name change allows us to better market ourselves through single focus and eliminates the disadvantages of separate focus.

Q. Many of your banks carry strong historical significance in the communities they serve. Does the name change hurt that historical role?

A. Historical perspective was not ignored in making the decision to change the corporate identity. We were very sensitive to that issue. However, in weighing the advantage of a single identity versus multiple names in today's increasingly competitive market, we feel the change is a necessity at this time."

14. About two million dollars was spent in October 1982 to advertise the change of name from "First National Bancorporation" to "IntraWest Financial Corporation" and the change to the names of the fourteen subsidiary banks. Approximately $888,000 was directed to the name change of "The First National Bank of Denver" to "IntraWest Bank of Denver, N.A." Nowhere in this publicity program was there any reference to continued use of the name "The First National Bank of Denver" or "First of Denver."

15. The name changes of the holding company and the subsidiary banks, including "The First National Bank of Denver," were effectuated October 1, 1982. Many advertisements and other publications announced the name changes and included statements such as: (1) "The First National Bank of Denver is now IntraWest Bank of Denver;" (2) "First of Denver is now IntraWest Bank of Denver;" (3) "IntraWest Bank of Denver, formerly First of Denver." These advertisements were placed in local and national publications including *The Wall Street Journal.*

16. Announcements of the name change were mailed to in-state banks, out-of-state banks, investment bankers, attorneys, various public officials, and the media. The public was apprised of the name change by ads in newspapers and magazines, as well as by a television advertisement showing the replacement of bank signs. The President of IntraWest Bank of Denver, as well as a marketing consultation and research firm, agreed that the efforts to acquaint the public with the new bank names were successful in that the public was made aware of the accomplished name change.

17. All forms, including forms used in the safe deposit box department of The First National Bank of Denver, which bore the name "The First National Bank of Denver" were either destroyed or were "silvered over" or "stamped over" with the name "IntraWest Bank of Denver." A few leftover forms bearing the words "The First National Bank of Denver" were gradually used from inventory after October 1, 1982, but these were employed for internal bank use only. The landlord of "First of Denver Plaza Building" approved the name change of the building to "IntraWest Building, IntraWest Tower," and the signs at all the subsidiary banks were changed.

18. On September 23, 1982, legal counsel for The First National Bank of Denver and First National Bancorporation wrote to the Comptroller of the Currency to object to the application by another unrelated bank for a bank name in which the alternative proposed name was "First of Denver, N.A." That letter stated in part: "It is likely that for years to follow the IntraWest Bank of Denver will be thought of and addressed by many parties as The First National Bank of Denver, The First of Denver, or The First." First National Bank of Denver and First National Bancorporation objected on the ground that the public would be confused or misled if a new bank were named "First of Denver." There was no indication in the letter that The First National Bank of Denver intended to continue to make any use of the name after the name change.

19. The Comptroller of the Currency approved the name changes of the IntraWest subsidiary banks on November 1, 1982.

20. On November 12, 1982, attorneys for IntraWest Financial Corporation and IntraWest Bank of Denver wrote to the Comptroller seeking his assistance in preventing others from using the IntraWest Banks' former names. By letter dated November 23, 1982, the comptroller responded that "[f]ollowing enactment of the Garn-St. Germain Depository Institutions Act of 1982, approval from this Office is no longer required for titles for new national banks or for title changes by existing national banks. Under 12 U.S.C. § 30, a notice only is required when a bank changes its title." The Comptroller further stated that he would not offer any advice on the subject of trademark infringment.

21. IntraWest Financial Corporation applied to the Colorado Secretary of State on November 18, 1982, for service mark registration of "First National Bank of Denver," "First of Denver," and the former names of other IntraWest subsidiary banks. Certificates for these marks were issued November 19, 1982.

22. In early December 1982, Western National Bank notified the Comptroller of the Currency that it had changed its name to First National Bank of Denver, and commenced use of the name with notification to the public that it was not connected with the bank formerly known as The First National Bank of Denver. Western National Bank is a national bank chartered in 1963 with its principal place of business at 300 South Federal Boulevard, Denver, Colorado.

23. IntraWest Financial Corporation and IntraWest Bank of Denver filed this action on December 16, 1982. Western National Bank has been preliminarily enjoined since December 21, 1982, from any further use of the name "First National Bank of Denver" pending the outcome of these proceedings.

24. IntraWest Bank of Denver did not use the name "The First National Bank of Denver" in any way for approximately three months after its name change. In December 1982, IntraWest Bank of Denver commenced very limited use of the name "The First National Bank of Denver" in its safe deposit department. IntraWest Bank of Denver placed a one time only 2½″ by 5″ advertisement for the "The First National Bank of Denver Safe Deposit Box Service" in the classified section of the Denver Post on December 13, 1982. On January 28, 1983, IntraWest ordered brochures describing "The First National Bank of Denver safe deposit box service" for use in that department. Safe deposit rental contracts and storage receipts bearing the name "The First National Bank of Denver," however, were overstamped with "IntraWest Bank of Denver." Forms printed after the name change identified IntraWest alone. An IntraWest brochure listing and detailing special services offered, including safe deposit services, did not use the name First National Bank of Denver.

25. The manager of the safe deposit department was not aware of any plans to use the name "The First National Bank of Denver" in that department until December 10 or 11, 1982.

26. The safe deposit department generated annual revenue of approximately $200,000 in 1983 and 1984.

27. IntraWest Bank of Denver, N.A. applied to the United States Patent and Trademark Office on January 26, 1983, for registration of the service mark "The First National Bank of Denver."

28. No document drafted prior to December 1982 indicated any intent to use the name "The First National Bank of Denver" after the name change to IntraWest. A February 25, 1982 memorandum from Clark E. Weaver, General Counsel of First National Bancorporation, set forth a checklist and timetable for matters to be accomplished concerning the proposed name changes. He stated that "Art Lucey will continue to arrange for use in commerce of both the logo and the exact names of the banks and Bancorporation." Plaintiffs assert that the referenced names are the then present names First National Bancorporation, First National Bank of Denver and First of Denver. A fair reading of the memorandum reveals, however, that the

referenced names are those of IntraWest Financial Corporation and its subsidiaries. I find that Weaver's trial testimony to the contrary is inconsistent with all the other evidence, and I do not accept it as credible.

29. Plaintiffs have proved no use of the name "The First National Bank of Denver" since the name change other than the very limited above described use in the safe deposit department.

30. On October 1, 1983, First Interstate Bank of Denver, N.A., a subsidiary of First Interstate Bancorporation, acquired IntraWest Bank of Denver. The merged bank does business under the name "First Interstate Bank of Denver, N.A." First Interstate Bank of Denver had been a competitor of IntraWest Bank of Denver. After the merger, First Interstate Bank of Denver moved into the premises occupied by IntraWest Bank of Denver at 633 17th Street, Denver, Colorado, and the building was renamed First Interstate Bank Building. IntraWest Bank's purchase by First Interstate Bank was advertised under the slogan "The First is First Again."

31. Around the time IntraWest Bank was acquired by First Interstate Bank, First Interstate Bank and IntraWest Financial Corporation entered into an agreement which provided that: 1) First Interstate Bank of Denver assigned its rights in "The First National Bank of Denver" to IntraWest Financial Corporation and 2) IntraWest Financial Corporation licensed First Interstate Bank to use the name "The First National Bank of Denver" for banking services for a period not to exceed eighteen months. This agreement was signed by Robert Boucher on September 30, 1983, on behalf of IntraWest Financial Corporation, and by Robert E. Lee, on behalf of IntraWest Bank of Denver, and again by Robert E. Lee on October 5, 1983, on behalf of the First Interstate Bank of Denver. The Board of Directors of the First Interstate Bank of Denver had no knowledge of this agreement at the time.

32. Pursuant to a second Agreement fully executed in late June 1984, First Interstate Bank of Denver assigned whatever rights it had in the name "First of Denver" to IntraWest Financial Corporation, which in turn licensed First Interstate Bank of Denver to use that mark for a period not to exceed eighteen months. The Agreement was signed by Robert Boucher on behalf of IntraWest Financial Corporation and by Robert E. Lee on behalf of First Interstate Bank of Denver.

33. In January or February 1984, First Interstate Bank of Denver began to make some use of "The First National Bank of Denver" mark in connection with its safe deposit box service.

34. There were no advertisements advising the public of the use by the First Interstate Bank of Denver of the mark "The First National Bank of Denver" in connection with its safe deposit box service. The only use of "The First National Bank of Denver" mark has been and is in small print on safe deposit forms and in a brochure describing safe deposit box services. The name "The First Interstate Bank of Denver" is displayed much more prominently on both the forms and the brochure.

35. First Interstate Bank published a book entitled "The Pioneer Western Bank: First of Denver 1860–1980," a detailed history of the First National Bank of Denver.

36. During February 1984, IntraWest Financial Corporation applied for a charter for a new bank to conduct business under the name "The First National Bank of Denver" in downtown Denver. Alternatively, IntraWest Financial Corporation may merge with another holding company, Affiliated Bankshares. If that merger is effected, a downtown Denver Affiliated subsidiary, Denver National Bank, may change its name to "The First National Bank of Denver."

37. On January 2, 1985, after a hearing, I preliminarily enjoined IntraWest Financial Corporation from opening a new bank under the name "The First National Bank of Denver." I found that for the plaintiff to open a new downtown Denver bank under the name "The First National Bank of Denver" or "First of Denver," or for the

plaintiff to rename some other existing downtown Denver bank with either or both of those names would cause public confusion and mislead consumers.

38. First Interstate Bank's right to use the mark "The First National Bank of Denver" under license from IntraWest Financial Corporation expired in April 1985.

## II. CONCLUSIONS OF LAW.

The following are my conclusions of law:

### A. Abandonment under the Lanham Act.

■ Abandonment is a defense to a claim of service mark infringement. Section 45 of the Lanham Act, 15 U.S.C. § 1127, defines abandonment as follows: "A mark shall be deemed to be 'abandoned'—
(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin."

The burden of proof is on the defendant to prove abandonment by clear and convincing evidence. *Friedman v. Sealy, Inc.,* 274 F.2d 255 (10th Cir.1959); 1 J. McCarthy, *Trademarks and Unfair Competition* § 17:3 at 772 (2d ed. 1984).

■ The first question to be addressed is which plaintiff owns, or owned, the service mark "The First National Bank of Denver." As a general rule, a trademark can only have one owner [2] and that owner is the entity that controls the good will associated with the mark. It is axiomatic that a trademark has no existence apart from the good will of the product or service it symbolizes. *See* 1 J. McCarthy, *supra* § 2:7 at 69. The threshold question is whose good will the name "The First National Bank of Denver" symbolizes or sym-

bolized, the bank or the holding company. Prior to acquisition of IntraWest Bank by First Interstate Bank, it was of only theoretical importance whether the holding company or the bank owned the mark. A mark used by a subsidiary may be registered either by the subsidiary or by the parent corporation under the "related company" provisions of the Lanham Act, 15 U.S.C. §§ 1055, 1127. The United States Patent and Trademark Office's "Trademark Manual of Examining Procedures" discusses ownership of marks as between parent and subsidiary corporations. Section 1201.02(b) provides:

"Where related companies are composed of a parent corporation and a subsidiary corporation or corporations, the owner of a mark is not necessarily always the parent corporation. Neither parent nor subsidiary is automatically the owner, nor is either one automatically excluded from ownership and the right to register. (*See Browne-Vintners Co., Inc., et al. v. National Distillers and Chemical Corporation,* 114 USPQ 483, headnote 3 (S.D.N.Y.1957).) Which party should register as owner depends on the particular fact situation, and fact situations vary greatly."

When IntraWest Bank of Denver was acquired by First Interstate Bank of Denver, however, the plaintiffs were obligated to decide whether the mark symbolized the management of the holding corporation or those things that were passed to First Interstate Bank—assets, officers and employees, and the premises. First Interstate Bank is not a "related company" of IntraWest Financial Corporation; First Interstate is in no way controlled by IntraWest Financial Corporation with respect to the nature and quality of any services offered. 15 U.S.C. § 1127. The good will associated with the mark, therefore, must reside in one institution or the other, and cannot reside in both.

In determining ownership, one must look first and foremost to the public's percep-

---

2. McCarthy discusses special problems of joint ownership not presented here. 1 J. McCarthy,

*Trademarks and Unfair Competition* § 16.14 at 749–57 (2d ed. 1984).

tion of the good will associated with the mark. McCarthy has aptly addressed this issue:

"While a trademark can be categorized as a kind of 'property' right, such a characterization often creates more confusion than clarity. This is because the 'property' parameters of a trademark are defined much differently than for any other kind of 'property.' In most cases, the exclusive 'property' right of a trademark is defined by customer perception. In the United States, both the creation of rights in marks and the test of invasion of those rights is determined by the perceptions and associations that exist in the minds of the relevant buying public. Hence, any 'property' in trademarks is created and defined by the mental state of customers. Trademark law has many presumptions, assumptions and a few overriding public policies, but the central key is customer perception." 1 J. McCarthy, *supra*, § 2:6 at 67.

Plaintiffs have presented absolutely no evidence as to whether the public associates or associated the name "The First National Bank of Denver" primarily with the bank or with the holding company.

Absent such evidence, I have examined the plaintiffs' conduct after the merger to determine whether, because of that conduct, the public would have necessarily associated the mark with the bank or with the holding company. Their behavior has not been consistent. IntraWest Bank of Denver applied for federal registration of the service mark "The First National Bank of Denver" on January 26, 1983. This application is evidence that the *plaintiffs* associated the mark with the bank rather than with the holding company, particularly because negotiations for the sale of the bank were already underway.

After the merger, First Interstate Bank assigned its rights in the mark to the holding company which then licensed the mark back to the bank for eighteen months. As stated above, First Interstate Bank used the mark in its safe deposit department on a very limited basis. Use of the mark by First Interstate Bank would lead the public to associate the mark with the *bank*. The advertising slogan "The First is First Again" apparently was designed to induce the public to associate The First National Bank of Denver with First Interstate Bank. First Interstate Bank's publication of the book detailing the history of The First National Bank of Denver would further tend to lead the public to associate the good will of The First National Bank of Denver with First Interstate Bank. The book (at p. xi) identifies First Interstate Bank as the successor to The First National Bank of Denver, and describes the merger "not as 'the demise of a fine old bank' but a logical continuation of the pioneer spirit that has led to a succession of firsts from 'The First's' very inception...."

In contrast, IntraWest Financial Corporation, not IntraWest Bank, applied for *state* service mark registration of the name "The First National Bank of Denver" in November 1982. The Corporation now asserts in this action that it is the rightful owner of the mark and that it can use the good will of The First National Bank of Denver to open a completely new bank with new assets, new officers and employees, and a new place of business. In 1984, IntraWest Financial Corporation publicly announced its plans to charter a new bank and filed a notice of its intent with the Comptroller of the Currency. First Interstate Bank has not opposed this plan, apparently acquiescing to IntraWest Financial Corporation's position that First Interstate Bank's only rights in the mark derived from the license from the holding company. Indeed, First Interstate Bancorporation, First Interstate Bank's holding company, has never shown any interest in either the mark or this litigation.

■ Because of this conflicting behavior, it is impossible to determine which plaintiff owned the mark.[3] The question, however, is moot. Whichever plaintiff owned the

---

**3.** Indicative of the confusion the plaintiffs have thrust upon the public and this court is the fact that two unrelated companies appear as plaintiffs in this action.

mark has abandoned it. Through the conduct summarized above and detailed more fully in the Findings of Fact, I find and conclude that First Interstate Bank and IntraWest Financial Corporation have caused the mark to lose its significance as an indication of origin. Therefore, it is deemed abandoned under part (b) of the Lanham Act's definition of abandonment set forth above. Plaintiffs failed to heed the admonition that trademarks, as symbols of good will, must be transferred very carefully, "lest the symbol and its good will go separate ways." 1 J. McCarthy, *supra,* § 2:6 at 68.

I also conclude that IntraWest Bank and IntraWest Financial Corporation abandoned the mark, within the meaning of part (a) of the Lanham Act's abandonment provision, at the time of the name change on October 1, 1982.

Abandonment under part (a) requires both discontinued use and the intent not to resume use. 15 U.S.C. § 1127; *Exxon Corporation v. Humble Exploration Co., Inc.,* 695 F.2d 96 (5th Cir.1983). IntraWest Bank discontinued all use of the mark for several months after the name change. Because the period of discontinued use was less than two years, the statutory presumption of abandonment does not apply. Nevertheless, abandonment may be inferred from the circumstances in cases where there has been a shorter period of discontinued use. Upon review of the complete record before me, I find as a fact that neither IntraWest Bank nor IntraWest Financial Corporation had any intent at the time of the name change to use the name "The First National Bank of Denver" after the name change. All of the numerous memoranda, meeting minutes, and correspondence regarding the name change are totally devoid of any evidence of intent to resume use of either name. None of the extensive advertising announcing the name change apprised the public of any continued use of the mark. IntraWest Bank discontinued all use of the mark until after Western National Bank began using the name in December 1982. Thereafter the only use of the mark was on a very limited

basis in the safe deposit department, as detailed above. Significantly, the manager of that department had no knowledge of any planned use of the name until December 10 or 11, 1982. In light of these circumstances, I find the testimony of the plaintiffs' witnesses regarding intent to resume use incredible. Objective evidence of intent not to resume use may outweigh subjective testimony to the contrary. As the Eighth Circuit stated in *Hiland Potato Chip Co. v. Culbro Snack Foods,* 720 F.2d 981, 983 (8th Cir.1983):

> "Objective evidence of abandonment outweighs a party's testimony that there was no intent to abandon a mark. 'If all a party had to do to avoid a holding of abandonment was to testify that he never had any intent to abandon the mark, then no mark would ever be held abandoned.' McCarthy, *Trademarks and Unfair Competition,* Vol. 1, § 17:3C (1973).

> 'A party's testimony that he had no intent to abandon may be outweighed by his actions, which may speak louder than his words: "[T]he purely subjective intention in the abandoner's mind to re-engage in a former enterprise at some indefinite future time is not sufficient to avoid abandonment where an objective analysis of the situation furnishes ample evidence to warrant the inference of abandonment." ' *Id.*"

█ Plaintiffs' belated use of the mark in the safe deposit department failed to secure or reestablish any rights in the mark. First, the use of the mark in the safe deposit department was merely an afterthought, a sham use devised in an attempt to prevent others from using the mark, not the bona fide use required to establish or retain rights in the mark. *Exxon Corporation v. Humble Exploration Co., Inc., supra; La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265 (2d Cir.1974); *Procter and Gamble v. Johnson & Johnson,* 485 F.Supp. 1185 (S.D.N.Y.1979), aff'd without opinion, *Interstate Brand Corp. v.*

*Way Baking Co.,* 199 U.S.P.Q. 317 (Mich. 1977).

Plaintiffs attempt to distinguish the instant case from other cases where use has been found to be sham on the ground that annual revenues from the safe deposit department amount to $200,000. I find and conclude, however, that the mark "The First National Bank of Denver" could not have contributed significantly to that revenue because of the very limited use of the mark in that department. It is implausible that the customers in IntraWest Bank's, and then First Interstate Bank's safe deposit department depended upon the mark to identify the source of the services.

■ In order for use to be bona fide, the mark must serve as an identifier. Mere warehousing of marks is impermissible under the Lanham Act. In *Exxon Corp. v. Humble Exploration Co., Inc., supra,* Exxon discontinued use of the mark "Humble" as a primary brand name but instituted a limited trademark maintenance program for the mark. The district court held that such limited use of a famous trademark solely for protective purposes was a use sufficient to preclude abandonment under the Lanham Act. The Fifth Circuit reversed, stating:

"In this case, the mark HUMBLE was used only on isolated products or selected invoices sent to selected customers. No sales were made that depended upon the HUMBLE mark for identification of source. To the contrary, purchasers were informed that the selected shipments would bear the HUMBLE name or be accompanied by an HUMBLE invoice but were the desired Exxon products. That is, the HUMBLE mark did not with these sales play the role of a mark. That casting, however, is central to the plot that the Lanham Act rests on the idea of registration of marks otherwise born of use rather than the creation of marks by the act of registration. That precept finds expression in the Lanham Act requirement that to maintain a mark in the absence of use there must be an intent to resume use. That expression is plain.

The Act does not allow the preservation of a mark solely to prevent its use by others. Yet the trial court's reasoning allows precisely that warehousing so long as there is residual good will associated with the mark. Exxon makes the same argument here. While that may be good policy, we cannot square it with the language of the statute. In sum, these arranged sales in which the mark was not allowed to play its basic role of identifying source were not 'use' in the sense of section 1127 of the Lanham Act." 695 F.2d at 100–01.

This reasoning is equally applicable in the instant case.

■ Second, I conclude that IntraWest Bank and First Interstate Bank acquired no rights in the mark because their use of the mark violated the national banking laws. Trademark rights cannot be acquired or maintained by illegal use of a trademark. 1 J. Gilson, *Trademark Protection and Practice* § 3.02[2] at 3–30.1— 3.30.2 (1984). The national banking laws provide that a national bank shall do business under a chartered name as follows:

"Upon duly making and filing articles of association and an organization certificate [a national banking association] shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and *in the name designated in the organization certificate,* it shall have power—...." 12 U.S.C. § 24 (emphasis added).

Defendant asserts that it was illegal for IntraWest Bank and First Interstate Bank to do business under two national bank names, their respective chartered names and the name "The First National Bank of Denver." Plaintiffs, on the other hand, argue that the defendant is confusing a trade name with a service mark; the banks conducted business under their chartered trade names but used "The First National Bank of Denver" as a service mark. Plaintiffs read 12 U.S.C. § 24 as placing no limitation on the nature or number of service marks a bank may use.

■ It appears to be a question of first impression whether 12 U.S.C. § 24 limits a national bank's use of service marks. I hold that it does. National banks are "quasi-public" institutions. *Van Reed v. People's National Bank,* 198 U.S. 554, 557, 25 S.Ct. 775, 776, 49 L.Ed. 1161 (1905). They are heavily regulated in order to maintain public confidence. *American Society of Travel Agents v. Bank of America National Trust and Savings Association,* 385 F.Supp. 1084, 1089 (N.D.Cal. 1974). If the plaintiffs' logic were adopted, a national bank chartered as "The First National Bank of New York" could use the service mark "City National Bank" for its trust service, "New York National Bank" for its safe deposit service, "Metropolitan National Bank" for its mortgage service, and so on. Such a practice would lead to public confusion and deception regarding the range of business a single national bank engages in and the bank's overall performance, *i.e.,* total assets and liabilities. While the national banking laws do not explicitly address the use of service marks, I conclude that 12 U.S.C. § 24's requirement that a bank do business under its chartered name prohibits such potentially deceptive use of service marks. I do not read the provision to bar limited, nondeceptive use of service marks by national banks, and I do not here establish a general rule distinguishing permissible use of service marks from impermissible use. I hold, in the circumstances here presented, that this particular use of a former chartered trade name to identify one discrete service violates 12 U.S.C. § 24.

As for IntraWest Financial Corporation, one basis of my finding of abandonment under part (b) of the Lanham Act's definition warrants further elaboration. If the holding company ever had any rights in the mark "The First National Bank of Denver," which I doubt because it is difficult to believe under these facts that the public associated the mark with the holding company rather than the bank, it abandoned those rights when it licensed the mark to First Interstate Bank after it sold the bank. Licensing of a mark is only permitted if the licensor controls the quality of services sold by the licensee under the mark. 1 J. McCarthy, *supra,* § 18:14 at 830–31; *Haymaker Sports, Inc. v. Turian,* 581 F.2d 257 (C.C.P.A.1978). There is absolutely no evidence that IntraWest Financial Corporation made any effort to control First Interstate Bank's use of the mark. A "naked license" effects an abandonment of the licensor's rights in the mark.

### B. *Abandonment under the Common Law.*

Plaintiffs argue that under the common law, unlike under the Lanham Act, a mark cannot be abandoned when significant residual good will in the mark remains. They cite the following authorities for this proposition: *American Photographic Publishing Co. v. Ziff-Davis Publishing Co.,* 135 F.2d 569 (7th Cir.1943); *Lyon Metal Products, Inc. v. Lyon, Inc.,* 134 U.S.P.Q. 31, 35 (T.T.A.B.1962); *Merry Hull and Co. v. Hi-Line Co., Inc.,* 243 F.Supp. 45 (S.D.N.Y. 1965); Restatement (First) of Torts § 752 comment b (1938).[4] I do not decide whether the plaintiffs correctly state the law.

■ Assuming, *arguendo,* that common law abandonment cannot occur where there is significant residual good will, I nonetheless conclude that IntraWest Financial Corporation has abandoned the mark. If there was ever any good will in the mark inuring to the benefit of the holding company, IntraWest Financial Corporation destroyed that good will through its license to First Interstate Bank and that bank's use of the mark. If any good will remains, it must be in First Interstate Bank; but that bank no longer claims any right to the mark.

---

**4.** The Restatement (Second) of Torts no longer includes a chapter on trademark infringement. The Reporters noted: "In the more than 40 years since [the First Restatement], the influence of Tort law has continued to decrease, so that it is now largely of historical interest and the law of Unfair Competition and Trade Regulation is no more dependent upon Tort law than it is on many other general fields of the law and upon broad statutory developments, particularly at the federal level." Introductory Note to Division Nine.

I originally granted IntraWest Financial Corporation's motion for preliminary injunction because at that time I was persuaded that Western National Bank's use of the name then would likely cause the public to confuse Western National Bank with Intra West Bank. Moreover, that order maintained what I then perceived as the status quo. Intra West Financial Corporation's position has mutated over the last two years. Now that it wants to open a new downtown Denver bank under the name "The First National Bank of Denver," it asserts that the public would not confuse the new bank with the prior First National Bank of Denver. IntraWest Financial Corporation cannot have it both ways. It cannot argue that the mark's good will resides in the *bank* and is preserved by the *bank's* use of the mark, and then, when convenient to suit its own purposes, argue that the good will does not reside in the bank at all but rather in the holding company. As one example of the inconsistency rife in the plaintiffs' position, I note page 8 of the plaintiffs' reply brief filed May 2, 1985. In one paragraph, the plaintiffs state: "Because the public to a large degree still associates First Interstate with the First National Bank of Denver, a rational and public interest serving basis for First Interstate's continued use of the mark exists." But First Interstate does not intend to continue use of the mark. In the very next paragraph, plaintiffs state that the *holding company* intends to use the name to open a new subsidiary bank. Plaintiffs have ignored the most basic principle of trademark law—that rights to a trademark are defined by public perception. A mark is destroyed when separated from the good will it symbolizes.

In sum, I conclude that defendant Western National Bank has proven by clear and convincing evidence that the plaintiffs abandoned all rights in the marks "The First National Bank of Denver" and "First of Denver." Western National Bank has the right to use the name "The First National Bank of Denver" because it first commenced use after abandonment. I make no finding regarding the right to use "First of Denver" since Western National Bank has made no use of that mark.

Accordingly,

IT IS ORDERED that the plaintiffs are permanently enjoined from any use of the mark "The First National Bank of Denver."

IT IS FURTHER ORDERED that Western National Bank has established the right to use "The First National Bank of Denver" as a trade name and service mark.

IT IS FURTHER ORDERED that the complaint and this action, as to all other aspects, are dismissed.

IT IS FURTHER ORDERED that the Clerk shall assess costs of this action against the plaintiffs and in favor of the defendant.