**ALLIANT ENERGY CORPORATION,**
a Wisconsin Corporation,
Plaintiff,

v.

**ALLTEL CORPORATION, a Delaware Corporation, Defendant.**

No. 4:02 CV 90511.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 15, 2004.

Cynthia L Buchko, Whyte Hirschboeck Dudek SC, Madison, WI, for Alliant Energy Corporation, Plaintiff.

Joseph S Goode, Whyte Hirschboeck Dudek SC, Madison, WI, for Alliant Energy Corporation, Plaintiff.

Thomas D Hanson, Hanson Bjork & Russell, Des Moines, for Alltel Corporation, Defendant.

Mark McCormick, Belin Lamson McCormick Zumbach Flynn, Des Moines, for Alliant Energy Corporation, Plaintiff.

Clark G McDermott, Hanson, Bjork, & Russell LLP, Des Moines, for Alltel Corporation, Defendant.

Thomas M Pyper, Whyte Hirschboeck Dudek SC, Madison, WI, for Alliant Energy Corporation, Plaintiff.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Before the Court are three motions for summary judgment. The first is Defendant's Motion for Partial Summary Judgment on its Counter-claim against the Plaintiff. (Clerk's No. 18). The second is Defendant's Motion for Partial Summary Judgment on Plaintiff's Declaratory Judgment Request. (Clerk's No. 86). The third is Plaintiff's Motion for Partial Summary Judgment on its breach of contract claims and request for declaratory relief. (Clerk's No. 90). The motions have been fully submitted and oral argument on all motions was held on October 7, 2004. Jurisdiction is proper under 28 U.S.C. § 1332, as there is complete diversity be-

tween the parties and the amount in controversy exceeds $75,000.

## I. BACKGROUND

Plaintiff, Alliant Energy Corporation ("AEC"), is a Wisconsin utility holding company that has controlling investments in companies engaged in the business of supplying public utility services to customers in Wisconsin, Iowa, Minnesota, and Illinois. Defendant, Alltel Corporation ("Alltel"), is a Delaware corporation engaged in, among other things, the business of supplying telecommunications utility services in various states across the United States, including Iowa. The relationship between the parties that eventually led to the present lawsuit began on April 29, 1998, when the Defendant filed a now settled trademark infringement suit against the Plaintiff in the United States District Court for the Southern District of Iowa. *See Aliant Communications, Inc. v. Interstate Energy Corp.,* Case No. 1–98–CV–80027.

Regarding the previous litigation, Aliant Communications, now Defendant, had a registered trademark, since 1996, in various "Aliant" marks. Interstate Energy Corp., now Plaintiff, had completed a merger and announced its new name, Alliant Energy Corporation. Due to the similarity between Plaintiff's announced name and Defendant's registered trademark, the trademark infringement suit was filed. The suit was dismissed on October 1, 1998, when the parties entered into a Settlement Agreement ("Agreement"). The meaning and interpretation of this Agreement is the subject of the motions now before this Court. In addition to territorial restrictions, the Agreement generally provided that Defendant could use the "Aliant" mark freestanding, while Plaintiff could only use Alliant in combination with the word Energy. After the Agreement was signed, Plaintiff completed registration of its currently held trademarks, "Alliant Energy" and "Alliant Energy Resources," and Defendant continued business under its name, Aliant. Under the Agreement, Plaintiff was to pay Defendant $4,000,000[1]. The specifics of the Agreement will be discussed more thoroughly *infra.*

On May 13, 1999, Defendant sold only its Canadian rights, as opposed to its United States rights, in the "Aliant" marks to a Canadian company ("Aliant Canada"). The Agreement between AEC and Alltel was mentioned, but not affected, as Canadian territory is not covered in the Agreement. On July 2, 1999, Defendant was involved in a reverse triangular merger, whereby Aliant became a wholly owned subsidiary of Alltel.[2] It is at this time that questions of abandonment of the "Aliant" marks become relevant. After Alltel acquired Aliant, a rebranding plan developed and was implemented to announce the acquisition to the public and to effectuate the name change. Alltel issued a press release on September 15, 1999, which stated the following:

> ALLTEL Name Goes up in Nebraska. ALLTEL officially comes to Nebraska on September 20 ... following Aliant shareholder approval in April and regulatory approval by the Federal Communications Commission in July, the company began the process of changing its name to ALLTEL. The process will be completed September 20, when retail lo-

---

1. The $4,000,000 was to be paid in five installments. The first payment was $1,500,000, followed by four $625,000 payments on the first day of October for the years 1999, 2000, 2001, and 2002.

2. The merger had been announced approximately six months earlier.

cations, vehicles and buildings will display the new ALLTEL identity.

At approximately the same time, Plaintiff and Defendant entered into correspondence discussing abandonment and the acquisition by Plaintiff of Defendant's rights in the "Aliant" marks. A December 22, 2000, letter from AEC referenced telephone conversations between the Plaintiff and Defendant concerning the purchase of the "Aliant" marks by AEC. Plaintiff never purchased Defendant's rights in the "Aliant" marks, nor did Defendant ever concede abandonment to the Plaintiff during this time.

On February 8, 2001, Defendant entered into an assignment trademark agreement ("Canadian Agreement") with Aliant Canada, transferring any and all rights and goodwill that Defendant had in the "Aliant" marks to Aliant Canada. The assignment was recorded by the United States Patent and Trademark Office ("PTO") on April 20, 2001. Plaintiff learned of the Canadian Agreement February 13, 2001, and made the installment payment on the Settlement Agreement on October 1, 2001. Plaintiff also engaged Aliant Canada in discussions of whether the terms of the Settlement Agreement would be upheld. On January 10, 2002, Aliant Canada agreed to abide by the terms of the Settlement Agreement, "on the understanding that [AEC] will continue to comply with the Agreement." *See* Clerk's No. 98 at 5.

Plaintiff filed the present Complaint on October 1, 2002, the same day that the final installment on the Settlement Agreement was due to Defendant. The Complaint alleges two breaches of contract: 1) Alltel's refusal to admit abandonment; and 2) Alltel's assignment of trademark rights in the "Aliant" marks to Aliant Canada without disclosing the terms of the Agreement. Plaintiff further requested that this Court issue a declaratory judgment that Defendant abandoned the "Aliant" family of marks prior to February 8, 2001. Defendant denied the allegations in the Complaint and counter-claimed for payment of $625,000, the final installment due on the Settlement Agreement. Since the filing of the Complaint, Aliant Canada has filed two trademark applications and formal statements on its intent to use.[3] Defendant has moved for summary judgment on its counter-claim and for summary judgment to deny Plaintiff's request for declaratory relief. Plaintiff has moved for summary judgment on its two counts of contract breach, declaratory request, and dismissal of Defendant's counter-claim.

The parties have very different ideas about their respective duties under the Agreement and the relevance of abandonment to these proceedings. Plaintiff claims that a finding of abandonment is crucial to every issue before the Court, while the Defendant claims that, as a matter of law, abandonment has no bearing on this case. It is with these facts in mind that the Court examines these motions for summary judgment and sets out to interpret the Agreement between the parties.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 56(c) provides for summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment "is an extreme remedy, and one

---

**3.** AEC's Resistance to Alltel's Motion for Partial Summary Judgment states: "On March 5, 2003, Aliant of Canada filed two trademark applications and formal statements on its intent to use ('ITU') with the PTO .... Aliant of Canada has sought to claim a priority date of February 19, 2003 based on its filings in Canada." Clerk's No. 68 at 16.

which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir.1975)). Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir. 1990). In motions for summary judgment, the court must make a distinction between what are the issues of law in the case and what are the issues of material fact.

■ It is well settled that federal courts, in diversity cases, must apply the substantive law of the forum state, in the absence of controlling federal law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Matters of contract construction and interpretation and choice of law rules are matters of substance, rather than procedure, so this Court must look to the laws of the forum state, Iowa. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that a federal court must employ the choice of law rules of the forum state). Under Iowa choice of law rules concerning contracts, the laws of the forum state are used unless application of foreign law is asserted and

proven by one of the parties. *Pa. Life Ins. Co. v. Simoni*, 641 N.W.2d 807 (Iowa 2002). Therefore, Iowa contract law is applicable, as the Agreement includes a choice of law clause designating application of Iowa law, and neither party has asserted that any other law is applicable. Under Iowa law, contract construction and interpretation are matters of law. *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999).

■ In order to prevail in a breach of contract claim, the moving party must prove: 1) the existence of a contract; 2) the terms and conditions of the contract; 3) that the moving party has performed all of the terms and conditions required under the contract; 4) the non-moving party's breach of the contract; and 5) the amount of damages resulting from the breach. *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993) (citing *Berryhill v. Hatt*, 428 N.W.2d 647, 652 (Iowa 1988)). At issue in the present case is what Defendant is obliged to do under the Agreement, and whether those duties have been performed. Therefore, this Court must first interpret the contractual duties, as a matter of law, and then view the facts in the light most favorable to the non-moving party to determine if there has been a breach of those duties.

■ In regard to the request for declaratory relief, under 28 U.S.C. sections 2201 and 2202, the Court must determine if an actual case or controversy exists to invoke the jurisdiction of this Court by viewing the facts in the light most favorable to the Plaintiff. If Plaintiff survives Defendant's motion, then the Court must view the facts in the light most favorable to the Defendant and determine whether the declaratory relief should be granted at the summary judgment stage.

## III. BREACH OF CONTRACT CLAIMS

Defendant moves for partial summary judgment on its counter-claim that Plaintiff owes Defendant $625,000 under Paragraphs 1 and 14 of the Settlement Agreement. These paragraphs read as follows:

1. The total payment by INTERSTATE[4] to ALIANT under this Agreement shall be $4,000,000.00, which shall be paid as follows: within 15 days after the effective date of this Agreement, INTERSTATE shall pay ALIANT by corporate check the amount of $1,500,000.00: and, on October 1 of each of the years 1999, 2000, 2001, and 2002, INTERSTATE shall pay ALIANT by corporate check the amount of $625,000.00. The address for payments shall be ALIANT Communications Inc., Attention Treasurer's Office, P.O. Box 81309, Lincoln, NE 68501-1309.

14. Each party's obligations hereunder shall terminate forthwith if and when the other party shall have abandoned its rights in its respective marks, except that any obligation of INTERSTATE to pay the amounts provided in paragraph 1, above, shall not terminate.

*See* Clerk's No. 21 at 23–34. The only payment that has not been made under the Settlement Agreement is the final payment of $625,000 that was due on October 1, 2002, the same day that Plaintiff filed the present lawsuit. AEC has excused its performance, stating that Alltel materially breached the Agreement and considers $625,000 an offset of the damages incurred as a result of the material breach. " 'It is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.' " *Van Oort Const. Co. v. Nuckoll's Concrete Serv., Inc.,* 599 N.W.2d 684, 692 (Iowa 1999) (quoting Restatement (Second) of Contracts § 237 at 215 (1981)). As shown in the plain language of the Agreement cited above, Defendant is entitled to the $625,000 unless it has materially breached the Agreement as set forth by the Plaintiff.

Plaintiff argues that Defendant materially breached the Settlement Agreement in two respects: (1) by failing to admit abandonment to AEC; and (2) assigning the marks to Aliant Canada without informing Aliant Canada of the Settlement Agreement or obtaining Aliant Canada's agreement to be bound by it.[5]

### A. Duty to Admit Abandonment

■ Central to each pending motion before the Court is the meaning of paragraph 14 of the Settlement agreement:

14. Each party's obligations hereunder shall terminate forthwith if and when the other party shall have abandoned its rights in its respective marks, except that any obligation of INTERSTATE to pay the amounts provided in paragraph 1, above, shall not terminate;

The parties have argued two very different interpretations of the above stated paragraph. However, "a contract is not ambiguous merely because the parties disagree over its meaning." *Id.* at 797 (citing *Tom Riley Law Firm, P.C. v. Tang,* 521 N.W.2d

---

4. Throughout the Agreement, AEC is referred to as INTERSTATE.

5. Defendant, Alltel, has argued that the original Complaint only stated one breach of contract claim, the assignment of the marks to Aliant Canada without Aliant Canada's knowledge of the Settlement Agreement. The Court disagrees with the Defendant and finds that the Complaint and subsequent contingent interrogatories were sufficient to put Defendant on notice of both breach of contract claims. Therefore, both claims are properly before this Court.

758, 759 (Iowa App.1994)). Ambiguity only exists if there is a "genuine uncertainty concerning which of two reasonable interpretations is proper." *Id.* (citing *Berryhill*, 428 N.W.2d at 654). "The existence of ambiguity, however, can be determined only after all pertinent rules of interpretation have been considered." *Id.*

 The cardinal rule of contract construction is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says. *Id.* (citing *Whalen v. Connelly*, 545 N.W.2d 284 (Iowa 1996)); *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997) (citing Iowa R.App. P. 14(f)(14)). The intent of the parties is determined, not at the time the lawsuit was filed, but at the time of the execution of the document, and is determined from the terms of the contract, what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the contract. *Hartig Drug Co.*, 602 N.W.2d at 798 (citing 17A Am.Jur.2d Contracts § 359 at 382); *Dickson*, 567 N.W.2d at 430 (citing *East Broadway Corp. v. Taco Bell Corp.*, 542 N.W.2d 816, 820 (Iowa 1996)). In interpreting a contract, the court must give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning. *Hartig Drug Co.*, 602 N.W.2d at 798 (citing *Magina v. Bartlett*, 582 N.W.2d 159, 163 (Iowa 1998)); *Dickson*, N.W.2d at 430 (citing *Lange v. Lange*, 520 N.W.2d 113, 119 (Iowa 1994)). The words must be given their plain meaning, but the words are to be examined, not in isolation, but in the context of the entire contract.

 Paragraph 14 states the effect that a future condition will have on each party's duties. A condition creates no right or duty in itself, but is merely a limiting or modifying factor. *See* 5 Williston on Contracts §§ 663 & 665. The paragraph has no effect unless the future event, "if and when the other party shall have abandoned its rights," occurs. If the condition occurs, the effect is, "each party's obligations hereunder shall terminate forthwith ... except that any obligation of INTERSTATE to pay the amounts provided in paragraph 1, shall not terminate." There is nothing ambiguous in the language "each party's obligations hereunder shall terminate." "The contract will be strictly construed if its words are clear and unambiguous." *SDG Macerich Prop. L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 587 (Iowa 2002).

 Plaintiff argues that the use of the singular possessive, "party's," indicates that only the non-abandoning party's duties terminate at abandonment and the abandoning party's obligations continue.[6] This argument ignores the use of the determiner, "each," before "party's." Each is defined as, "Being one of two or more distinct individuals having a similar relation and often constituting an aggregate." Webster's Third New Int'l Dictionary 713 (1961). Therefore, "each party's," refers to *both* AEC's duties and Alltel's duties. This is similar to the parties' use of the term "either party's," in paragraph 13 to identify that both parties have rights to issue certain statements. Plaintiff also draws special attention to the language of the condition, "when the *other party* shall have abandoned" (emphasis added). The

---

**6.** Plaintiff first argues this contract construction in its Reply Brief in Support of its Motion for Partial Summary Judgment (Clerk's No. 116). Earlier, in Plaintiff's Resistance to Alltel's *Motion for Summary Judgment* it stated, "Aliant USA and Interstate mutually agreed that all obligations under the Agreement (except for Interstate's payment obligations) would terminate if and when a party to the agreement abandoned its rights in its respective trademarks." (Clerk's No. 68 at 2).

Court disagrees that this language dictates the outcome proffered by Plaintiff. First, the "other party" language is only describing the condition, while "each party's" describes the condition's effect. Even assuming, arguendo, that "each party's," in combination with, "when the other party," is conflicting language, when viewed in context of the entire Agreement, there is no ambiguity that the intent of the parties at the signing of the Agreement was that both parties' duties terminate at abandonment.

██ Plaintiff contends that if paragraph 14 is read to release both parties from their obligations under the Agreement, paragraph 17 is a nullity and the payment of the $4,000,000 is without purpose. A contract is to be interpreted to give effect to the entire contract, and "an interpretation that gives reasonable meaning to all terms is preferred to one that leaves a term superfluous or of no effect." *Dickson*, 567 N.W.2d at 430. Paragraph 17 reads:

> 17. The parties will cooperate with each other as needed in providing consents or otherwise in effecting trademark or service mark registration consistent with the terms of this Agreement.

Plaintiff argues that the only purpose of the "cooperation" is to aid the non-abandoning party in registering the marks. This position is unavailing. First, besides written correspondence with Alltel, Plaintiff has not taken any steps to register the "abandoned" "Aliant" marks. Second, the express duty to "cooperate" noted in paragraph 17 is to be done "consistent with the terms of this agreement." One of the terms of the Agreement is paragraph 14, stating that all obligations cease at abandonment. Third, the Agreement, which sets forth rights and restrictions of the parties' respective use of their trademarks, provides numerous opportunities for "co-operation." For example, at the time the Agreement was signed, AEC did not have active registrations of the "Alliant Energy" marks. Had there been dispute from the PTO over registration due to the presence of the "Aliant" marks, Alltel would have been obligated to cooperate and inform the PTO of the Agreement. Further, had either party wished to expand its rights in its respective marks in accordance with the Agreement restrictions, and faced opposition, cooperation would have been called upon by the other party. Therefore, paragraph 17 is not read to be a nullity under the plain reading of paragraph 14, that all obligations cease at abandonment.

Further, Plaintiff claims that if there is no duty of abandonment, it received nothing for the $4,000,000 payment to Alltel. This also is not true. The Agreement arose out of a trademark infringement suit that Defendant brought against the Plaintiff. At oral argument, Plaintiff stated that, at the time of the infringement suit, it had only filed a registration for the use of Alliant Energy and, therefore, there were no damages to Alltel necessitating a $4,000,000 payment. However, the affidavit of Betty Swan of AEC indicates that over one million dollars had been spent in the Alliant Energy name at the time of the original suit, and to lose the infringement case and be forced to suspend intended use of the marks would have caused AEC damage. Further, Plaintiff purchased the right to use "Alliant Energy" marks, which it did register, and is using today free from any assertion from other parties of superior rights in the marks. If today, Plaintiff feels like $4,000,000 was too much to pay for its received consideration, it cannot fight it by rewriting the contract. Plaintiff and Defendant wrote the Settlement Agreement together and freely entered into it. It is not reasonable that the parties intended for one party's duties to

continue indefinitely, while the other party no longer had any obligations.

Plaintiff has finally argued that, even if paragraph 14 is read to discharge both parties of obligations under the Agreement, there is still an implied duty for the abandoning party to inform the non-abandoning party of the abandonment. The purpose is to inform the non-abandoning party that it is no longer bound to the Agreement. This duty arises under the implied doctrine of good-faith and fair dealing, which Iowa recognizes. *Harvey v. Care Initiatives Inc.*, 634 N.W.2d 681, 684 n. 4 (Iowa 2001); *see* Restatement (Second) of Contracts § 205 at 99 (1981); 17A Am.Jur.2d Contracts § 380 at 401 (1991). "The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). One of the expected benefits of the Agreement was that there would be no continuing obligations if one party abandoned its trademark. Another expected benefit, however, was protection of each party's trademark rights. A duty to admit abandonment and release the other party from the Agreement goes beyond the implied duty of good faith and fair dealing because it goes against the agreed common purpose of trademark protection. This is especially true in a situation such as the present one, where both parties have a "good-faith" argument regarding the issue of abandonment. The plain language of the Agreement simply states, "when the other party shall have abandoned its rights." The Agreement says nothing to indicate how the parties will come to learn of the abandonment and, further, says nothing to modify what con-stitutes abandonment under the Lanham Act. As a sampling of abandonment law shows, it goes beyond the justified expectations of AEC that Alltel would forfeit its rights in the "Aliant" marks, without asserting the protections granted to registered marks under the Lanham Act. 15 U.S.C. §§ 1051 *et seq.* (1946).

### 1. *Abandonment under the Lanham Act.*

 Abandonment generally results in an involuntary forfeiture of rights in a mark. *See Cumulus Media, Inc. v. Clear Channel Communications*, 304 F.3d 1167, 1175 n. 11 (11th Cir.2002) ("If it were a voluntary forfeiture there would be no litigation."); *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed.Cir. 1990) ("In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest."); 2 J. McCarthy, *Trademarks and Unfair Competition* § 17:12 at 17–19 (4th ed. 2004) ("Since abandonment results in a forfeiture of rights, the courts are reluctant to find an abandonment."). Both parties hold federally registered trademarks and are aware of the Lanham Act's criteria for determining abandonment and the extensive case law that has developed surrounding this issue.

The Lanham Act states:

A mark shall be deemed "abandoned" if either of the following occurs:

(1) When its use has been discontinued with intent not to resume use. Intent not to resume may be inferred from circumstances. Nonuse for three years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct by the owner, including acts of omission as well as commission, causes the mark to be-

come the generic name for goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127. In the present case, Plaintiff argues that abandonment has "clearly" occurred under the first situation described in section 1127. However, an examination of case law highlights that "abandonment" is not clear under the present facts, especially not so clear as to give rise to an implied contractual duty to admit abandonment.

 A trademark owner's certificate of registration is "prima facie evidence of the validity of the registration and continued use of the registered mark." *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed.Cir.1989). In the present case, Alltel held certificates of registration on various "Aliant" marks up until the time of the assignment to Aliant Canada. It follows that the burden of proof is placed upon those who seek cancellation or abandonment of the marks. *Cerveceria*, 892 F.2d at 1023 (citing 15 U.S.C. § 1057(b)). Therefore, when the parties used the word abandonment in their Agreement, they were aware that it is the party seeking a cancellation who holds the burden of proof. Accordingly, without express contract words to the contrary, it is not reasonable that the parties would have intended that this burden of proof be switched, whereby the "abandoning" party had to concede or admit abandonment.

 Next, to make a ruling on abandonment, two things must be found: (1) non-use; and (2) intent not to resume use. Plaintiff cites the Eighth Circuit's ruling in *Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981 (8th Cir. 1983), to support its assertion that there is clear abandonment in the present case. In

*Hiland Potato Chip Co.*, the Eighth Circuit, relying on facts that were not clearly erroneous, found that the plaintiff, who had brought a trademark infringement suit against the defendant, abandoned the "Kitty Clover" trademark. *Hiland Potato Chip Co.*, 720 F.2d at 984. The district court found there had not been use and the intent not to resume use was based on a communication which stated: "Because of the apparent lack of interest on the part of the large eastern corporation owning the Kitty Clover Brand Name ... the Kitty Clover, Cardinal and Clary House Brand Names will be eliminated from Missouri and Arkansas." *Id.* at 982. Such a public announcement, " 'may be a circumstance from which an intent not to resume may be inferred.' " *Id.* at 983 (quoting *Sutton Cosmetics (P.R.) Inc. v. Lander Co.*, 170 U.S.P.Q. 461, 462 (S.D.N.Y.1971)), *aff'd as modified*, 455 F.2d 285 (2d Cir. 1972). Similarly, in the present case, there was a press release from the Defendant on September 15, 1999, announcing the name change to Alltel. However, while an intent not to resume use may be inferred from such a statement, there also must be non-use. The party defending against abandonment may also present evidence to support an intent to resume use. *See Cumulus Media, Inc.*, 304 F.3d at 1178 ("While such an announcement is the type of circumstance from which intent not to resume use may be inferred ... it does not alone serve to make a prima facie showing of abandonment. A defendant must also introduce evidence of nonuse."). In *Hiland Potato Chip Co.*, the Eighth Circuit relied not only on the public announcement, but also on a trademark infringement notice sent to the defendant that did not state any use of the Kitty Clover marks, or any intent to resume use of the marks. *Hiland Potato Chip Co.*, 720 F.2d at 984. Factually distinguishable in the present case are the letters between

Plaintiff and Defendant discussing the sale of the "Aliant" marks. Efforts to license and assign trademarks are evidence of an intent to resume use, as demonstrated in Second Circuit case law.

The Second Circuit discusses the "intent to resume use in the reasonably foreseeable future" requirement under the Lanham Act. *Silverman v. CBS Inc.*, 870 F.2d 40 (2d. Cir.1989). In *Silverman*, the Second Circuit found that CBS had abandoned the "Amos n' Andy" marks through twenty-one years of non-use and no intent to resume use in the reasonably foreseeable future. No intent to resume use was found because, "CBS has not been endeavoring to exploit the value of its marks, failing to do so only because of lack of business opportunities." *Silverman*, 870 F.2d at 47. In the present case, Defendant did endeavor to exploit the value of the marks, and in fact did assign the marks to Aliant Canada, creating a situation factually in line with two previous Second Circuit rulings that were consistent with the *Silverman* decision:

In *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980) we rejected a claim of abandonment based on seven years of non-use where the initial decision to cease use resulted from a decision of the state legislature and the state, which was the trademark owner, continuously sought to sell the mark along with the mineral water business to which it applied. Similarly, in *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053 (2d. Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985),we rejected an abandonment claim where, during a brief period of non-use, the proprietor tried to sell the mark, its associated goodwill, and some other assets and, upon failing to find a buyer, became a subsidiary of a company. In both cases, the proprietor of the mark had an intention to exploit the mark in

the reasonably foreseeable future by resuming its use or permitting its use by others.

*Id.* at 47. Similarly here, the Defendant argues that even if there is a finding of non-use, the discussions with AEC and Aliant Canada show an intention to permit its use by others in the reasonably foreseeable future. Plaintiff submits evidence that in June and August of 2000, Defendant was not interested in selling the marks to Aliant Canada simply because of its competitor status. *See Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 101 (5th Cir.1983) ("The Act does not allow the preservation of a mark solely to prevent its use by others.") However, at that date, there is also arguable use due to the presence of the May 1999/2000 phonebooks bearing the "Aliant" mark. Further, soon after that date, Defendant did enter into negotiations with Aliant Canada and Plaintiff regarding assignment. This is strong evidence that Alltel had an intent to resume use in the reasonably foreseeable future and commercially exploit the goodwill remaining in the "Aliant" marks.

Despite a name change, a trademark may still possess significant goodwill and remain a valuable asset to a company. "Goodwill does not ordinarily disappear or completely lose its value completely overnight. Erosion from non-use is a gradual process." *Defiance Button*, 759 F.2d at 1060. "A trademark is a symbol of existing good will." 2 J. McCarthy, *supra* § 17:14 at 17–23 (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918)). Goodwill "represents the reputation developed by its owner for the nature and quality of goods or services sold by him ...." *Defiance Button*, 759 F.2d at 1059. Even in cases such as the present one, where there are extensive efforts to notify the public of the name change, there is still the possibility that goodwill remains in the marks.

*See id.* at 1061 ("The continued existence and value of the company's goodwill and of the mark symbolizing it may well be evidenced by C & C's offer to purchase the mark for $10,000 immediately after the auction sale."). Similarly here, Aliant Canada purchased the "Aliant" family of marks from Alltel for $250,000, which evidences goodwill remaining in the marks, avoiding a clear finding of abandonment. Remaining goodwill, or the public's association of the Aliant name with Defendant, is also evidenced by the August 10, 2000, phone call from Cindy Sorensen, an Alltel customer, who was not yet aware of the name change.

AEC cites the Fifth Circuit's decision in *Exxon Corp.* to support its argument that Alltel ceased use of the "Aliant" marks. In that case, the Fifth Circuit found that the then two year prima facie case (now three years) for abandonment had been met, and that the purported uses were not "commercial use" as dictated by the Lanham Act. *Exxon Corp.,* 695 F.2d at 100. However, the court remanded the case to the district court for a determination of whether Exxon had an "intent to resume use" of the marks, because, "[t]he court recognizes that the goodwill associated with the mark HUMBLE has immense value to Exxon. That fact, coupled with the efforts under the trademark maintenance program, could suggest Exxon's intent to resume use of the mark ...." *Id.* at 102. On remand, The United States District Court for the Northern District of Texas found that Exxon had an intent to resume use. The district court examined four cases that dealt with "intent to resume use" and came to the conclusion that, "the most that can be said to reconcile the conflicts in the cases is that each case is founded on its own facts." *Exxon Corp. v. Humble Exploration Co., Inc.,* 592 F.Supp. 1226, 1230 (N.D.Tex.1984). Despite the "warehousing" language used by the Exxon marketing department, such as, "they continue to be valuable Company assets which must be protected and maintained," the district court found that, because of the value of the goodwill in the HUMBLE marks and Exxon's efforts to maintain its use, there was an intent to resume use, even when the re-use came roughly three years after the last use. It follows then, that Alltel could have reasonably believed that these particular facts supported a case for no abandonment.

Cases are even less clear in rebranding or name change cases, such as the present one. In rebranding cases, the parent corporation, here Alltel, relies on the goodwill of the acquired business to establish itself in a new market. The conflicting law is highlighted in the comparison of two cases, one where abandonment was found after three months of non-use and one where no abandonment was found after 13 months of non-use.

*Intrawest Fin. Corp. v. Western Nat'l Bank of Denver,* 610 F.Supp. 950 (D.Co. 1985) concerned a trademark infringement case where abandonment was raised as a defense. The United States District Court for the District of Colorado found that plaintiffs had abandoned "The First National Bank of Denver" marks. The plaintiffs spent over two million dollars to notify the public of the name change, and after October 1, 1982, the only use of the name was internally. The case is similar to the facts before this Court, in that it concerns abandonment after a name change where there have been extensive efforts to notify the public of the change. However, a few factual differences require emphasis. First, after October 1, 1982 there was no use of the "First National Bank of Denver" for three months, except for internally. In the present case, there is the question of whether the 1999/2000 phone books bearing the "Aliant" name was commercial use. Also, in *Intrawest,* the defendant had

actually began use of the trademark, therefore, gaining rights in the abandoned marks. Here, Plaintiff did not attempt to use the "abandoned" marks. Finally, in *Intrawest*, the court found that if any argument for residual goodwill could be made, the party who could assert it was not a party to the proceedings. "If any goodwill remains, it must be in First Interstate Bank, but that bank no longer claims any right to the mark." *Intrawest*, 610 F.Supp. at 961 (declining to analyze the residual goodwill argument). In the case at bar, Alltel is the party that may claim residual goodwill.

In 2002, the Eleventh Circuit discussed abandonment of a trademark after a voluntary name change, and found that there was no abandonment. *Cumulus Media, Inc.*, 304 F.3d 1167. In that case, the parties owned competing radio stations. The plaintiff was formerly known on the air as, "The Breeze," but discontinued this identifier in September 2000, and became known as "Star 98." It announced the change through on-air advertisements and changed its music format. Thirteen months after the name change, the defendant began using the on-air name, "The Breeze." In not finding abandonment, the court found relevant the following facts: 1) "The Breeze" continued to appear on some material that had not yet been changed, such as a billboard, business cards, and promotional materials; and 2) third parties maintained a continuing association of "The Breeze" with the plaintiff. *Cumulus Media Inc.*, 304 F.3d at 1174. The Eleventh Circuit found there was no abandonment despite the radio stations public announcements of its name change.

Without ruling specifically on whether an abandonment occurred in the present case, the above discussed cases highlight that determining abandonment is a lengthy process. This is not to say that Plaintiff does not have a viable case that

the marks were abandoned. At issue before the Court, however, are the parties contractual duties under the Agreement. Due to the presence of the "Aliant" Marks on the May 1999/2000 telephone books and the efforts to commercially exploit the marks through assignment, Defendant also has an argument that the marks were not abandoned. It does not offend the spirit of the contract for the "abandoning" party to defend its rights in a trademark, and it goes beyond the implied duty of good faith and fair dealing to obligate a party to voluntarily forfeit goodwill they have built up in a mark. Neither party would have reasonably intended for "cooperation" to encompass a forfeiture of protectable rights.

Further, nothing in the Agreement required that AEC wait for Alltel's assurance that it had abandoned the rights. If the marks were abandoned, the condition was met and the abandoned marks were free for any party to acquire, including AEC. Under trademark law, "Once abandoned, a mark may be seized immediately and the person so doing may build up rights against the whole world." 2 J. McCarthy, *supra* § 17:2 at 17–3 (citing *Sutton Cosmetics, Inc.*, 170 U.S.P.Q. at 461). There is no requirement that the former trademark holder notify the PTO of its "abandonment," and there is nothing in the Agreement to modify this generally understood concept in trademark law. Therefore, as a matter of law, there is no duty to admit abandonment under the Agreement. The Court now turns to Plaintiff's second assertion of contract breach.

**B.** *Duty to Inform Aliant Canada of the Settlement Agreement*

██ Plaintiff's second allegation of contract breach deals with the assignment of the "Aliant" marks to Aliant Canada. There is no dispute from either party that

the Agreement was freely assignable, but Plaintiff argues that Defendant breached paragraph 20 of the Agreement by failing to disclose to Aliant Canada the existence of the Agreement and by failing to obtain its consent to be bound by it. Paragraph 20 reads:

> 20. The terms of this Agreement shall be binding on, and inure to the benefit of, the parties, their successors, assigns and related companies.

This paragraph sets forth an express duty that the assignees and successors of the parties' trademarks are bound to all of the duties and conditions expressed within the Agreement. To give effect to the intent of the parties, what is necessarily implied from this paragraph is a duty that the assignor inform the assignee of the Agreement, so that the assignee will be bound by it. When assigning the rights to Aliant Canada, Alltel did not fulfill this duty. Therefore, it must be determined whether this breach was material, so as to excuse AEC's duty to pay the final installment. To determine if a breach is material, the court:

> looks to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected, account being taken of the possibility of adequate compensation for that part. It also looks to the other party—to the possibility that it will suffer forfeiture, to the likelihood that it will cure its failure and to the degree that its behavior comported with standards of good faith and fair dealing. Most significant is the extent to which the breach will deprive the injured party of the benefit it justifiably expected.

*Van Oort Constr. Co.*, 599 N.W.2d at 692 (citing Farnsworth on Contracts § 8.16 at 496–97 (2d ed.1998) (citing Restatement Second of Contracts § 241 (1981))). Also relevant to the discussion of materiality is paragraph 23 of the Agreement:

> 23. Noncompliance by one party with respect to one or more of its obligations hereunder shall not constitute a breach or violation of this Agreement unless the other party gives notice of any such noncompliance in writing and the noncompliance is not cured within ninety days of such notice.

Accordingly, if one party believed the other party to be in breach of the Agreement, it had to first give notice to the "offending" party before it could pursue breach remedies.

Since this is a motion for summary judgment, the Court turns to the agreed upon material facts:

1. Alltel did not inform Aliant Canada of the Agreement prior to the assignment.

2. The February 8, 2001, assignment to Aliant Canada contains the following disclaimer of warranty: The Trademarks are sold, conveyed, and assigned to Purchaser on an "as is" basis. Vendor does not make any warranty representation or covenant, express or implied, with regard to the Trademarks or its intellectual property or other rights thereto, including, without limitation, the existence validity or enforceability of any registrations for the Trademarks, or the absence of any infringement or superior rights with regard to any of the Trademarks.

3. AEC learned of the assignment on February 13, 2001 by letter from Alltel.

4. AEC paid to Alltel the October 1, 2001, installment payment.

5. On January 10, 2002, Aliant Canada sent AEC a letter which reads: "As a result of this review and on the understanding that your company

will continue to comply with the Agreement, we have instructed our business representatives that the Aliant trademark is not to be used in the United States with 'ENERGY' (as ENERGY is defined in the Agreement), except: (i) where necessary or incidental to the sale or delivery of COMMUNICATIONS (as COMMUNICATIONS is defined in the Agreement): or (ii) in connection with business relationships with parties relating to ENERGY, but only in conjunction with the marks of such parties."

6. Plaintiff filed the present Complaint on October 1, 2002.

The benefit reasonably expected from paragraph 20 is that assignees are bound to the Agreement, thereby giving the other party assurance that its trademarks would not be infringed. There are no material facts in dispute to preclude a finding that the assignment of the marks to Aliant Canada, without disclosure of the Agreement's existence, deprived AEC of the protections provided by paragraph 20. To begin, the Canadian Agreement's disclaimer of warranty did not assert that the marks were assigned without restrictions. Next, the January 10, 2002, letter from Aliant Canada to AEC provided to AEC assurance that Aliant Canada would abide by the Agreement. The letter constituted a cure of the breach. A cure, therefore, reinstates AEC's duty to pay the final installment. Plaintiff's only dispute that the letter is not a cure is that Aliant Canada has not admitted abandonment. However, that is not a material fact because, as discussed in the previous section, there is no duty to admit abandonment and all obligations cease upon abandonment. Aliant Canada has agreed to be bound by the Agreement if AEC so chooses. In addition, Plaintiff has not produced direct evidence of compliance with the notice requirement contained in paragraph

23. All of the "notice" correspondence between Plaintiff and Defendant that has been presented to the Court discusses the abandonment issue and not the assignment. Finally, the fact that the October 1, 2001, installment payment was made to Defendant, almost eight months after Plaintiff's knowledge of the assignment, evidences the immateriality of the breach.

In short, Plaintiff has not been deprived of the benefit it reasonably expected— Aliant Canada's compliance with the Agreement. Alltel's initial breach of not informing Aliant Canada of the Agreement was cured well before the date of the filing of the Complaint, and was not a material breach excusing AEC's duty to make the final installment. Plaintiff has not identified any material facts in dispute to preclude these findings at the summary judgment stage. "Once the moving party has carried its burden, the non-moving party must . . . designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. Plaintiff's only argument that the January 10, 2002, letter is not a cure of the breach, is that Aliant Canada also refuses to admit abandonment. There is no such duty under the Agreement. In considering motions for summary judgment, "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505

The Court notes that, although Defendant's conduct was not a material breach of the Agreement, it was a breach and Plaintiff may still pursue their claim for damages resulting from that breach. *See West v. Jayne*, 484 N.W.2d 186, 189 (Iowa 1992) (holding that even though a breach is not material to discharge duties, the plaintiff can seek other breach damages); Restatement (Second) of Contracts § 242 cmt. a. ("Even then, since any breach gives rise to a claim, a party who has cured a

material breach has still committed a breach, by his delay, for which he is liable in damages."). The Court now turns to Plaintiff's Request for Declaratory Relief.

## III. DECLARATORY RELIEF

Count II of Plaintiff's Complaint is a request for declaratory relief, asking that this Court declare that Alltel abandoned the "Aliant" family of marks. There is no question that on the day the Complaint was filed, October 1, 2002, Alltel had no rights in the "Aliant" marks. The rights were either lost through abandonment or by assignment to Aliant Canada. The request, therefore, is that this Court declare that Alltel abandoned the trademarks sometime before the Canadian Agreement was executed, February 8, 2001. Alltel has moved for summary judgment, arguing that there is no case or controversy between the parties on the issue of abandonment. AEC also moves for summary judgment, stating that there is an actual conflict concerning whether AEC is still bound to the Agreement.

■ Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. sections 2201 and 2202. Under the Declaratory Judgment Act, "in cases of actual controversy ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief may be sought ...." 28 U.S.C. § 2201. "The word 'actual' is one of emphasis rather than definition .... In providing remedies and defining procedure in relation to cases and controversies in the constitutional sense...." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). "This is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Public Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952). The case

"must be a real and substantial controversy admitting of specific relief through a decree of a conclusive notice, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co.*, 300 U.S. at 241, 57 S.Ct. 461. "The Declaratory Judgment Act exists as an instrument to protect the citizen against the dangers and damages that may result from his erroneous belief as to his rights under state or federal law." *Public Serv. Comm'n*, 344 U.S. at 250–51, 73 S.Ct. 236 (Reed, J., concurring) (citing *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943)).

■ There are two principal situations where the granting of declaratory relief is proper: 1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; and 2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings. *Alsager v. Dist. Ct. of Polk County*, 518 F.2d 1160, 1163 (8th Cir.1975). In the present case, a declaration of abandonment neither clarifies nor settles the legal relations at issue in the breach of contract claims because there is no duty to admit abandonment. Plaintiff contends, however, that a declaration will relieve it from uncertainty in regards to its obligations under the Agreement and in regards to expanding its trademark rights.

Plaintiff claims that, without a declaratory ruling on abandonment, it is still bound by the Agreement. If Plaintiff is, however, restricted in its use of its "Alliant Energy" marks or prohibited from using the "Aliant" marks under the Agreement, it is not Alltel that can enforce the restrictions, but the assignee, Aliant Canada. There are no facts before this Court to show that Aliant Canada has told AEC that it must abide by the Agreement or threatened

AEC with a lawsuit. In fact, the January 10, 2002, letter gives AEC the choice of continuing with the Agreement as if there is no abandonment, or putting the Agreement aside as if there is abandonment. Therefore, AEC is free to not be bound by the Agreement. "The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries and some useful purpose to be achieved in deciding them." *Public Serv. Comm'n*, 344 U.S. at 243–244, 73 S.Ct. 236. It was AEC that sought out Aliant Canada's assurances, which have been given if AEC agrees to do the same. " 'Basically, the question in each case is whether the facts alleged, under all of the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Sherwood Med. Indus., Inc. v. Deknatel, Inc.*, 512 F.2d 724, 727 (8th Cir.1975) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). The facts before the Court show no such substantial controversy to warrant the issuance of a declaratory judgment. Based on the undisputed facts, it appears that Plaintiff does not wish to be free of the Agreement, but rather wants a declaration of abandonment so it can assert rights in the "Aliant" family of marks.

In regards to Plaintiff's freedom to expand its trademark rights, there is no case or controversy, as no party is threatening AEC with an infringement suit, nor has AEC attempted to gain rights in the "Aliant" marks. Under the Lanham Act, district courts have the power to find abandonment and to cancel registrations in an "action involving a registered mark." 15 U.S.C. § 1119. " 'Involving' cannot mean the mere presence of a registered trademark, but must be read as involving the

right to use the mark and thus the right to maintain the registration." *Windsurfing Int'l Inc. v. AMF Inc.*, 828 F.2d 755 (Fed. Cir.1987). Plaintiff's mere declarations of a desire to expand their "Alliant Energy" marks, without more, is not sufficient to create a case or controversy necessary to invoke federal jurisdiction. *See Windsurfing Int'l*, 828 F.2d at 759 (stating that mere desire to use a mark does not constitute a justiciable controversy); *CIBER Inc. v. CIBER Consulting, Inc.*, 326 F.Supp.2d 886 (N.D.Ill.2004) ("Defendants' stated 'intentions' with respect to their use of 'CIBER' without more, however, are insufficient to create a justiciable controversy."). Neither Alltel, nor Aliant Canada, contest the "Alliant Energy" marks, and the Plaintiff's present activity does not put it at risk of infringement liability. *See Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed.Cir.1995) ("The second part of our test of declaratory justiciability respecting patent rights requires that the putative infringer's 'present activity' place it at risk of infringement liability .... The residual possibility of a future infringement suit based on Chase's future acts is simply too speculative a basis for jurisdiction over Chase's counterclaim for declaratory judgments of invalidity."). Nor would a declaration by this Court relieve the parties from the "uncertainty, insecurity, and controversy giving rise to the proceedings."

If this Court declares that the marks were abandoned before the assignment to Aliant Canada, then a variety of issues regarding trademark rights arise, namely, what rights pass to an assignee of abandoned marks. *See* 2 J. McCarthy, *supra* § 18:19 at 18–35. Therefore, a declaration by this Court would substantially affect the rights of a third party not present in this litigation. Further, AEC has submitted that Aliant Canada claimed a priority date of February 3, 2003, indicating it is

not relying on Defendant's previous priority date, but rather, is establishing rights in the marks by its own use. Since Plaintiff has not made use of the "Aliant" marks, a declaration of abandonment would not put its rights ahead of Aliant Canada. As Aliant Canada has not asserted that it will enforce the Agreement, there is not a controversy before the Court that is appropriate for judicial determination. Unlike the facts of *Aetna*, where the declaratory relief resolved a dispute between parties facing each other in an adversary proceeding, the Defendant has no future interest in the "Aliant" marks. *Aetna Life Ins.*, 300 U.S. at 241. Therefore, this is not a situation where there is "a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding . . . ." *Id.* at 241, 57 S.Ct. 461. Because there is no case or controversy present, the Defendant's motion for partial summary judgment to dismiss the request for declaratory relief is granted.

## IV. CONCLUSION

In conclusion, Defendant's Motion for Partial Summary Judgment on its Counter–Claim (Clerk's No. 18) and Defendant's Motion for Partial Summary Judgment on Plaintiff's Request for Declaratory Relief (Clerk's No. 86) are GRANTED. Plaintiff's Motion for Summary Judgment (Clerk's No. 90) is DENIED. The only remaining issue before the Court, therefore, is Plaintiff's breach of contract claim concerning the assignment to Aliant Canada.

IT IS SO ORDERED.