# IN THE COURT OF APPEALS OF IOWA

No. 21-0014
Filed December 15, 2021

**DOLLY INVESTMENTS, LLC,**
    Plaintiff-Appellant,

**vs.**

**MMG SIOUX CITY, LLC, DALE MAXFIELD, and MAXFIELD MANAGEMENT GROUP, LLC,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, Judge.

Dolly Investments, LLC appeals a district court ruling determining it breached a lease. **AFFIRMED.**

Jacob B. Natwick and Zack A. Martin of Heidman Law Firm, P.L.L.C., Sioux City, for appellant.

Philip S. Bubb and Brandon R. Underwood of Fredrikson & Byron, P.A., Des Moines, for appellees.

Heard by Vaitheswaran, P.J., and Tabor and May, JJ.

**MAY, Judge.**

This is a dispute between a commercial landlord, Dolly Investments, LLC (Dolly), and a tenant, MMG Sioux City, LLC (MMG).[1] The district court found Dolly materially breached the parties' lease by entering the building and changing the locks. We affirm.

## I. Background Facts

Sioux City Golden Corral, LLC (SCGC) owned commercial property in Sioux City. In March 2017, SCGC leased the property to MMG for use as a Golden Corral restaurant.[2] Then SCGC sold the property to Marina and Leon Reingold and assigned its interest in the lease to them. The Reingolds, in turn, transferred their interests in the property and the lease to Dolly.[3]

MMG operated the Golden Corral restaurant largely without issue, though MMG was sometimes late paying taxes and rent. But by April 2019, MMG was struggling. MMG emailed Dolly and explained the rental rate was "putting a huge strain on the restaurant and unless we can figure out how to improve sales, decrease rent dollars, or both the Sioux City Golden Corral will not survive." MMG also noted, "There are other Golden Corral [f]ranchises in the Midwest that might be interested in the Sioux City location."

---

[1] Dale Maxfield and Maxfield Management Group, LLC were also named defendants because they guaranteed the lease on behalf of MMG. We refer to defendants collectively as MMG.

[2] It was a triple-net lease or a term of fifteen years with two five-year options to extend.

[3] The Reingolds are the only members in Dolly.

In June, MMG paid half of the rent due[4] and informed Dolly that it was considering selling the Golden Corral business. On June 17, the Sioux City Journal reported that the Golden Corral permanently closed. Dolly's banker notified Dolly of the article. Two days later, MMG told Dolly, "We do not have the rent at this time." Dolly responded with an email demanding the remaining rent. On June 25, Dolly visited the restaurant to find it closed. Dolly then contacted a locksmith to break the lock and change it. The next day, MMG's counsel advised Dolly that MMG did not consent to Dolly's actions.

Dolly sent MMG a notice to cure dated July 3, 2019. The notice stated MMG owed Dolly $28,125.00 (for the remaining half of June and all of July) in past due rent. The notice gave MMG fifteen days to cure the default.

MMG did not cure within fifteen days.[5] So Dolly sent a letter, dated August 22, 2019, terminating the lease. Dolly also brought this action against MMG. Dolly claimed MMG "breached" the lease "by failing to pay according to the terms of the Lease." As relief, Dolly sought all past due rent, future rent, future taxes, and more.

MMG responded with counterclaims for breach of contract and conversion. MMG alleged the lease prohibited Dolly from reentering the property and "excluding MMG . . . unless and until" Dolly "provided MMG a 15-day period in which MMG could cure an alleged default" and "MMG failed to so cure." "Nonetheless," MMG alleged, Dolly entered and changed the locks without first "providing written notice of default to MMG" or the fifteen-day cure period. In MMG's view, these actions "constituted a breach" of the lease. They were also a

---

[4] The rent was due on the first of each month.
[5] MMG had not paid any past due rent as of the date of trial.

conversion because, once the locks were changed, MMG was denied "access to their personal property" inside the building.

Following a bench trial, the district court initially determined (1) MMG materially breached the lease by failing to pay all of the June 2019 rent, (2) Dolly was "entitled to recover the lease payments due which had accrued at the time of trial and no more," (3) MMG proved its conversion claim, and (4) MMG was entitled to recover the value of the property left in the restaurant.

MMG filed a motion to reconsider. The district court was persuaded. In its amended ruling, the court found Dolly committed "the first material breach" of the lease by entering and changing the locks on June 25. This "excused MMG's further obligations under the lease agreement," the court found. So the court limited Dolly's recovery of rent to the remaining half of the June 2019 rent. The court also awarded Dolly attorney fees.

Dolly appeals.

## II. Scope and Standard of Review

"Because a lease is a contract, we apply ordinary contract principles to determine its meaning and legal effect." *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 727 (Iowa 2014). "[O]ur review of the district court's contract interpretation and construction is at law." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 683 (Iowa 2020). "The district court's factual findings have the effect of a special verdict and are binding on us if supported by substantial evidence." *Metro. Prop. & Cas. Ins. Co. v. Auto-Owners Mut. Ins. Co.*, 924 N.W.2d 833, 839 (Iowa 2019).

## III. Discussion

Dolly raises three claims on appeal: (1) MMG repudiated the lease, (2) MMG materially breached the lease by failing to pay all of the June 2019 rent, and (3) Dolly did not materially breach the lease by entering the property on June 25. We separately address the repudiation claim and then address Dolly's material breach claims in tandem.

### A. Repudiation

First, we address Dolly's claim that MMG repudiated the lease. However, before we may address the merits, we must first consider whether the issue is preserved for our review. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Following our review, we conclude Dolly never presented a repudiation claim to the district court. And the district court never ruled on a repudiation claim. So we conclude error is not preserved on this claim.

### B. Who Materially Breached First

Next, we consider whether the district court correctly determined Dolly materially breached the lease first. This determination is critical because when one party materially breaches a contract, the other party is no longer bound by the terms of the contract. *See Van Oort Constr. Co., Inc. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 692–93 (Iowa 1999) (holding the defendant did not breach a contract by non-performance when the plaintiff had already materially breached the parties' contract).

To identify a material breach, Iowa uses the Restatement (Second) of Contracts, which

> looks to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected, account being taken of the possibility of adequate compensation for that part. It also looks to the other party—to the possibility that it will suffer forfeiture, to the likelihood that it will cure its failure, and to the degree that its behavior comported with standards of good faith and fair dealing. Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected.

*Slashfrog, LLC v. Quick*, No. 19-0031, 2019 WL 6358193, at *5 (Iowa Ct. App. Nov. 27, 2019) (quoting *Van Oort Constr. Co.*, 599 N.W.2d at 692).

To determine who materially breached first, we must interpret the lease agreement. The law prefers "[a]n interpretation which gives a reasonable, lawful, and effective meaning to all terms" over "an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Alta Vista Props.*, 855 N.W.2d at 727 (citation omitted). "Additionally, a lease includes not only what is expressly stated by its terms but also what is necessarily implied to give effect to its express terms." *Id.*

The question here is whether (1) MMG materially breached by failing to pay all of the June 2019 rent on June 1 or (2) Dolly materially breached by entering the property and changing the locks on June 25. Because MMG's potential breach occurred first, we begin by considering whether it constituted a material breach that would allow Dolly to lawfully change the locks, effectively retaking possession.

Like the district court, we do not believe it was. The words of the lease show that the parties contemplated—and made agreements concerning—situations in which MMG would not timely pay the full amount of rent. Specifically, the lease

provides that "[i]n the event of a breach by [MMG] in the payment of any sum due and payable to [Dolly]" under the lease, MMG would have "fifteen (15) days [to cure] after [MMG]'s receipt of written notice" of the breach from Dolly. If "the breach is not cured within" those fifteen days, then the "breach" is considered a "default," and Dolly can pursue remedies, including several specified options. One of the specified remedies is to "reenter the Premises . . . and take possession of the same, and expel or remove" MMG.

Like the district court, we think the point of these provisions was to give MMG both written notice and a defined opportunity to cure before its late payment of rent would become a "default"—and a material breach—that could justify Dolly in locking MMG out of the building. *See Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 589 (8th Cir. 2007) (applying Delaware law and noting a contract term requiring notice to cure and providing a specified time to cure must be followed). If, instead, we were to view MMG's late payment as a material breach that would justify such remedies *before* MMG had received notice and opportunity to cure, we would "effectively render meaningless" the notice-and-cure provisions. *See All. Metals, Inc., of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 903 (11th Cir. 2000) (applying Pennsylvania law and interpreting contractual "notice and cure" requirements).

In our view, then, MMG's failure to pay the complete June 2019 rent could not mature into a material breach until fifteen days after it received Dolly's written notice to cure. Dolly's notice to cure was dated July 3, 2019. So MMG would have

materially breached on July 18 (at the earliest)[6] by not paying the remaining rent due. And so Dolly materially breached first by entering the property and changing the locks on June 25.

But Dolly notes the lease also included this provision entitled "Right of Entry"

[Dolly] reserves the right to enter upon the [p]remises at any time during regular business hours, upon giving at least twenty-four (24) hours prior notice to [MMG] (except in the event of an emergency) to inspect the same or for the purpose of exhibiting the same to prospective purchasers or mortgagees or, during the last six (6) months of the [t]erm, to prospective lessees.

Dolly contends this provision permitted Dolly to inspect the property without twenty-four-hours prior notice because there was an "emergency," namely, its banker had shared the online article about the restaurant closing. Because the lease does not define "emergency," we give the word its "ordinary meaning" in the relevant context. *See Iowa Fuel & Mins., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991) (noting the "principle of contract construction . . . that while words are to be given their ordinary meaning, particular words and phrases in a contract are not to be interpreted in isolation"). In this context, we think "emergency" means a highly time-sensitive event, like a fire or water leak, that would justify dispensing with the twenty-four-hour-notice requirement. *See Emergency*, Merriam-Webster, https://www.merriam-webster.com/dictionary/emergency (last visited Nov. 17, 2021) (defining emergency as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" and "an urgent need for assistance or relief"). But nothing like that happened here. While news of the restaurant's closure could have reasonably concerned Dolly and

---

[6] It is not clear from the record when MMG received the notice to cure.

its lender, that news did not constitute an "emergency" that would require immediate entry on less than twenty-four hours of notice. Moreover, even if an "emergency" had occurred, the "Right of Notice" provision would only have allowed Dolly to "enter" and "inspect." Nothing in the provision authorized Dolly to change the locks and leave MMG with no way to access the property, no way to access its personal property inside, and no way to show the property to potential buyers of the Golden Corral business (who would also be potential subletters).

Dolly also relies on *Brown v. State Central Bank* for the proposition that "'changing of the locks [is] a permissible peaceful means for the [owner] to take possession of the property' particularly when such property appears abandoned." *See* 459 F. Supp. 2d 837, 843 (S.D. Iowa 2006). *Brown* involved different facts: Unlike Dolly, the bank who changed locks in *Brown* had an "undisputed" right to take "possession of the property." *Id.* at 842.[7] In any event, Dolly's "abandonment" argument ignores the fact that MMG had over $100,000 in personal property inside, all of the utilities were on, and a salaried MMG employee was monitoring the location. All of these facts make clear that the property was not abandoned by MMG.

Dolly also highlights that MMG never asked for access to the property after the locks were changed. So, Dolly argues, MMG was not deprived of any benefit. *See Alliant Energy Corp. v. Alltel Corp.*, 344 F. Supp. 2d 1176, 1189–91 (S.D. Iowa 2004). But the day after Dolly entered the building, MMG's counsel notified Dolly

---

[7] Moreover, the *Brown* court was not focused on contract issues. Rather, the question was whether "the bank's conduct" gave "rise to an implied cause of action derived from Iowa's [forcible entry and detainer] statute." *Brown*, 459 F. Supp. 2d at 843.

that MMG was aware Dolly had changed the locks and taken over possession of the property. And counsel made clear that MMG did not consent to Dolly's actions. Plus, even if MMG had said nothing, MMG was still deprived of access to the building—a central benefit of any lease.

Like the district court, we conclude that when Dolly entered the property and changed the locks to exclude MMG on June 25, Dolly materially breached the lease and excused MMG's further compliance with the lease. So Dolly is not entitled to any monetary damages beyond half of the June 2019 rent as awarded by the district court.

**AFFIRMED.**